588 S.E.2d 167

**Jessie L. GRAHAM, Plaintiff Below, Appellant,**

v.

**David A. WALLACE, D.D.S., M.S., Defendant Below, Appellee.**

No. 30846.

Supreme Court of Appeals of West Virginia.

Submitted April 15, 2003.

Decided May 7, 2003.

Starcher, C.J., dissented and filed opinion.

**180**

Mark R. Staun, Esq., The Segal Law Firm, Charleston, West Virginia.

Kathryn Reed Bayless, Esq., Bayless & McFadden, L.L.P., Princeton, West Virginia, Attorneys for Jessie L. Graham.

Ancil G. Ramey, Esq., Jason D. Stevens, Esq., Steptoe & Johnson, Charleston, West Virginia.

Darrell E. Baker, Jr., Esq., Baker & Whitt, PLLC, Memphis, Tennessee, Attorneys for David A. Wallace, D.D.S., M.S.

PER CURIAM:

This is a medical malpractice case where a jury rendered a verdict for the appellee and defendant below, Dr. David A. Wallace, against the appellant and plaintiff below, Jessie L. Graham. On appeal, Mr. Graham asserts that the circuit court erred in admitting into evidence the testimony of Dr. Wallace's expert witness, Dr. Phillip Hutt, regarding the proper way to perform and read a radiological procedure called an arthrogram. Because we agree with Mr. Graham, we reverse and remand for a new trial.

## I.

## FACTS

Mr. Graham first visited Dr. David A. Wallace, an oral and maxillofacial surgeon, in 1984, complaining of headaches. Pursuant to Dr. Wallace's examination of Mr. Graham, he performed a panorex x-ray of his jaw. This

type of x-ray shows a picture of the jaw bone. Dr. Wallace suspected that Mr. Graham suffered from problems with his temporomandibular joints.

The temporomandibular joint (hereinafter "TMJ") is a ball and socket joint located on each side of the face just in front of the ears, which connects the mandible or lower jaw to the temporal bone of the skull. According to The Merck Manual of Medical Information (Home Edition) 513 (Robert Berkow, M.D., et al, eds., 1997):

The [TMJ] is the most complicated joint in the body: It opens and closes like a hinge and slides forward, backward, and from side to side. During chewing, it sustains an enormous amount of pressure. The [TMJ] contains a piece of specialized cartilage called a disk that keeps the lower jawbone and skull from rubbing against each other.

In this opinion, we will refer to this specialized disk as the meniscus. People with a disorder of the TMJ may experience tenderness of the chewing muscles, clicking or locking of the joints, or recurring headaches that do not respond to usual medical treatment. *See* The Merck Manual at 513–14. As noted above, Mr. Graham suffered from recurring headaches.

To help determine whether Mr. Graham had a TMJ disorder, Dr. Wallace sent him to Dr. Stephen P. Raskin, a radiologist, who performed an arthrogram and a tomogram. An arthrogram is an x-ray film of the TMJ, after the injection of contrast dye, which shows the TMJ's inner structures. One purpose of an arthrogram is to reveal displacement or damage to the meniscus. In order to picture how an arthrogram works, one of the lawyers at trial suggested that it may be helpful to think of the inside of the TMJ as a bologna sandwich. The bread on the top is the superior compartment of the TMJ, and the bread on the bottom is the inferior compartment. The piece of bologna in between is the meniscus.

There was testimony at trial that an arthrogram can be conducted in two different ways. First, dye may be injected by needle into both the superior and inferior compartments so that the shape of the meniscus shows up on the x-ray. Alternatively, dye may be injected into the lower compartment, and if dye shows up in the superior compartment on the x-ray, this means that the dye traveled through a tear or hole in the meniscus. At trial, Dr. Raskin testified that he intended to inject the dye into both the superior and inferior compartments of Mr. Graham's TMJ in order to get an outline of his meniscus. However, when he attempted to put the needle into the inferior compartment, he missed and hit soft tissue. Therefore, Dr. Raskin reported the results of the arthrogram as, "Unsuccessful (no charge) TMJ arthrography with initial filling of the superior compartment and subsequent muscular extravasation." In other words, the dye missed the lower compartment and escaped into the muscles.

Dr. Raskin also performed a tomogram which is a detailed x-ray of the jaw bones. Dr. Raskin's tomogram revealed "Bilateral degenerative eburnation of the condyles, right greater than left." In other words, the ball parts of the joints on both sides of the skull showed a rubbing away of the bone's surface, exposing them to motion and friction, and resulting in roughening of the bones. This rubbing away was worse on the right side.

Based on his examination, including the results of the tomogram and arthrogram, Dr. Wallace diagnosed Mr. Graham with degenerative joint disease of the right TMJ and a torn meniscus. Dr. Wallace subsequently operated on Mr. Graham in June 1984, removed the meniscus, and replaced it with a Vitek implant. Dr. Wallace testified that during surgery he found a hole in the attachment of the ligament to the meniscus, and he considered the meniscus to be irreparable.

In 1987, Mr. Graham returned to Dr. Wallace and had surgery performed for the same problem on his left jaw. This time, however, Dr. Wallace did not insert an implant because of increasing dissatisfaction with those devices in the medical community.

Dr. Wallace saw Mr. Graham in his office for the last time in June 1987. In July 1987, Dr. Wallace received a letter from the manufacturer of the Vitek implant about potential

problems with the implant. In December 1990, the federal Food and Drug Administration (hereinafter "FDA") recalled Vitek implants and issued a safety alert. In January 1991, Dr. Wallace received a letter from the FDA regarding the recall. For reasons that are disputed, Dr. Wallace never personally contacted Mr. Graham about the recall. Another doctor removed Mr. Graham's Vitek implant in October 1993.

In October 1995, Mr. Graham sued Dr. Wallace in the Circuit Court of Mercer County. In his complaint, Mr. Graham alleged:

(a) failure to properly assess the plaintiff's condition in 1984 in accordance with professional criteria then known;

(b) failure to treat the plaintiff with more conservative modalities prior to performing surgery which involved the insertion of the proplast implant;

(c) failure to provide adequate follow-up care to the plaintiff, including the failure to advise plaintiff of any product recall or warnings issued by professional organizations and regulatory agencies concerning the many failures of the proplast implant;

(d) failure to perform any diagnostic testing subsequent to the placement of the implant in plaintiff which would have disclosed the failure of the implant prior to 1993; and

(e) other negligent acts.

The original trial, held in March 1999, resulted in a verdict for Mr. Graham. Dr. Wallace appealed to this Court, and in *Graham v. Wallace*, 208 W.Va. 139, 538 S.E.2d 730 (2000) ("*Graham v. Wallace I*"), this Court reversed and remanded. We held that the circuit court committed reversible error in denying Dr. Wallace's request to call two rebuttal witnesses.

There was a second trial in July 2001, in which the jury returned a verdict for Dr. Wallace. The circuit court subsequently denied Mr. Graham's motion for a new trial, and he now appeals to this Court.

## II.

## STANDARD OF REVIEW

On appeal, Mr. Graham asserts that the circuit court committed error below by admitting evidence at trial which should not have been admitted. With regard to the admission of evidence, this Court has held:

> The West Virginia Rules of Evidence and the West Virginia Rules of Civil Procedure allocate significant discretion to the trial court in making evidentiary and procedural rulings. Thus, rulings on the admissibility of evidence and the appropriateness of a particular sanction for discovery violations are committed to the discretion of the trial court. Absent a few exceptions, this Court will review evidentiary and procedural rulings of the circuit court under an abuse of discretion standard.

Syllabus Point 1, *McDougal v. McCammon*, 193 W.Va. 229, 455 S.E.2d 788 (1995).

We have explained that "[a] trial court abuses its discretion if its ruling is based on an erroneous assessment of the evidence or the law." *Bartles v. Hinkle*, 196 W.Va. 381, 389, 472 S.E.2d 827, 835 (1996) (citation omitted). In other words, " '[u]nder the abuse of discretion standard, we will not disturb a circuit court's decision unless the circuit court makes a clear error of judgment or exceeds the bounds of permissible choices in the circumstances." ' *Hensley v. West Virginia DHHR*, 203 W.Va. 456, 461, 508 S.E.2d 616, 621 (1998) (*quoting Gribben v. Kirk*, 195 W.Va. 488, 500, 466 S.E.2d 147, 159 (1995)). Finally, under the abuse of discretion standard, "the specific degree of deference accorded very well may depend on the nature of the ruling being reviewed." *Stephen L.H. v. Sherry L.H.*, 195 W.Va. 384, 395 n. 15, 465 S.E.2d 841, 852 n. 15 (1995), *superseded by statute on other grounds as stated in Sharon B.W. v. George B.W.*, 205 W.Va. 594, 519 S.E.2d 877 (1999). Accordingly, we now proceed to review the circuit court's decision concerning the challenged evidence to determine whether, in the context of the entire trial, the circuit court incorrectly assessed the law or the evidence or made an impermissible choice.

## III.

## DISCUSSION

We find it necessary to discuss only the first issue raised by Mr. Graham which is

whether the circuit court erred in permitting Dr. Wallace's expert witness, Dr. Phillip Hutt, to testify concerning the standards of care for taking and interpreting arthrograms where these opinions were not disclosed to Mr. Graham during the course of written discovery or through the deposition testimony of Dr. Hutt.[1]

At trial, one theory of Mr. Graham's case was that Dr. Wallace misread the results of the arthrogram performed on Mr. Graham by Dr. Raskin. Mr. Graham's counsel elicited testimony from Dr. Wallace that he did not know whether Dr. Raskin injected the superior or inferior compartment first, but he assumed that he injected the inferior compartment first because that is the routine way of performing an arthrogram. Dr. Raskin, who was a fact witness called by Dr. Wallace, testified, however, that he injected the superior compartment first.

Prior to calling Dr. Raskin, Dr. Wallace called Dr. Phillip Hutt to testify as an expert in oral and maxillofacial surgery. Dr. Wallace's counsel elicited testimony from Dr. Hutt that, according to a professional radiology text, the proper way to perform an arthrogram is to first inject the dye below the meniscus, in the inferior compartment. Dr. Hutt added that "[t]here are some people that inject both spaces to show the whole shape, but my personal feeling is the proper way to do it is to inject into the lower space[.]" He further opined that it was within the standard of care for an oral and maxillofacial surgeon practicing in 1984 to presume, when reading the results of an arthrogram, that the dye was first injected into the lower space, or, inferior compartment.

■ Mr. Graham now asserts that it was improper for the circuit court to allow Dr. Hutt's testimony on the proper way to perform an arthrogram because at no time prior to trial was Dr. Hutt's opinion on this issue disclosed. Mr. Graham points to this Court's holding in Syllabus Point 5 of *Prager v. Meckling,* 172 W.Va. 785, 310 S.E.2d 852 (1983), which states:

Factors to be considered in determining whether the failure to supplement discovery requests under Rule 26(e)(2) of the Rules of Civil Procedure should require exclusion of evidence related to the supplementary material include: (1) the prejudice or surprise in fact of the party against whom the evidence is to be admitted; (2) the ability of that party to cure the prejudice; (3) the bad faith or willfulness of the party who failed to supplement discovery requests; and (4) the practical importance of the evidence excluded.

According to Mr. Graham, Dr. Hutt's testimony was a surprise because during his deposition four weeks earlier, he said nothing about the arthrogram procedure. Second, Mr. Graham's counsel tried unsuccessfully to cure the prejudice on cross-examination of Dr. Hutt. Third, the failure to disclose was egregious because this was a vigorously litigated case and there was extensive discovery. Finally, the importance of Dr. Hutt's testimony cannot be overstated. Mr. Graham concludes that the testimony at issue was introduced as an ambush tactic to confuse, mislead, and prejudice.

Dr. Wallace responds that he fully disclosed Dr. Hutt's testimony prior to trial and that Mr. Graham could not have been surprised by it. As proof, Dr. Wallace first sets forth in his brief a portion of his May 29, 2001, response to Mr. Graham's interrogatories in which he indicated that Dr. Hutt was expected to testify that "the radiographic studies performed on the plaintiff's jaw in 1984 demonstrated a degree of boney [sic] abnormality consistent with advanced TMJ disease that could not have been treated successfully with splint therapy or other non-surgical methods." Second, Dr. Wallace points us to his March 15, 2001, witness disclosure statement which indicated, in part, that "Dr. Hutt is specifically expected to testify concerning diagnosis, surgical technique, follow-up and recall, surgical removal of VITEK devices, and the potential damage associated with VITEK implants." Third, Dr. Wallace notes Dr. Hutt's deposition testi-

---

1. Mr. Graham also asserts that Dr. Hutt was not qualified to testify to the proper way to perform an arthrogram. We do not find it necessary to address this assignment of error.

mony, taken prior to the second trial, at which the following questioning occurred:

[Mr. Graham's counsel]: Following initial contrast injection, a small amount of contract [sic] is demonstrated in the superior compartment, right?

[Dr. Hutt]: Right.

[Mr. Graham's counsel]: What's that mean?

[Dr. Hutt]: That means one of two things. Either he injected it into the superior compartment.

[Mr. Graham's counsel]: Right.

[Dr. Hutt]: Or he injected it into the inferior compartment and it wound up in the superior compartment. That's what it means.

[Mr. Graham's counsel]: You don't know, do you?

[Dr. Hutt]: No, I said that.

[Mr. Graham's counsel]: Let's assume for a minute that he injected in the superior compartment?

[Dr. Hutt]: Hypothetically?

[Mr. Graham's counsel]: Yeah.

[Dr. Hutt]: Okay.

[Mr. Graham's counsel]: And it did not—what's that word—extravasate into the inferior compartment. Let's assume that, since you don't know.

[Dr. Hutt]: Okay.

[Mr. Graham's counsel]: What's that tell you?

[Dr. Hutt]: It tells me he injected the wrong compartment, but—no, he injected it into the superior compartment, that's what it tells me.

Dr. Wallace concludes from this questioning that while Mr. Graham's counsel chose not to question Dr. Hutt at length about the performance of the arthrogram, it is obvious that counsel had both an appreciation of the significance of the procedure as well as Dr. Hutt's opinion about the manner of the proper administration of the procedure. Finally, Dr. Wallace argues that even if the admission of Dr. Hutt's testimony was improper, the jury verdict could not have been affected thereby. This is because the undisputed evidence at trial indicated that Dr. Wallace's

diagnosis of a perforated meniscus was accurate. Accordingly, Dr. Wallace's reliance, or lack thereof, on the arthrogram is irrelevant and had no impact on the jury.

In considering this issue, we begin with the Rules of Civil Procedure which govern the way trials of civil actions are to be conducted. According to Rule 26(b)(4):

Trial preparation: experts.—Discovery of facts known and opinions held by experts, otherwise discoverable under the provisions of subdivision (b)(1) of this rule and acquired or developed in anticipation of litigation or for trial, may be obtained only as follows:

(A)(i) A party may through interrogatories require any other party to identify each person whom the other party expects to call as an expert witness at trial, to state the subject matter on which the expert is expected to testify, and to' state the substance of the facts and opinions to which the expert is expected to testify and a summary of the grounds for each opinion.

In addition, Rule 26(e) provides that,

Supplementation of responses.—A party who has responded to a request for discovery with a response that was complete when made is under no duty to supplement the response to include information thereafter acquired, except as follows:

\*  \*  \*  \*  \*  \*

(B) The identity of each person expected to be called as an expert witness at trial, the subject matter on which the expert is expected to testify, and the substance of the expert's testimony.

The essence of Mr. Graham's assignment of error is that Dr. Wallace failed to fully disclose the substance of Dr. Hutt's expected testimony prior to trial in violation of Rule 26. As a result, Mr. Graham was unfairly surprised.

█ This Court explained in *McDougal v. McCammon*, 193 W.Va. 229, 236–37, 455 S.E.2d 788, 795–96 (1995), that "one of the purposes of the discovery process under our Rules of Civil Procedure is to eliminate surprise. Trial by ambush is not contemplated by the Rules of Civil Procedure." The dis-

covery process is the manner in which each party in a dispute learns what evidence the opposing party is planning to present at trial. Each party has a duty to disclose its evidence upon proper inquiry. The discovery rules are based on the belief that each party is more likely to get a fair hearing when it knows beforehand what evidence the other party will present at trial. This allows for each party to respond to the other party's evidence, and it provides the jury with the best opportunity to hear and evaluate all of the relevant evidence, thus increasing the chances of a fair verdict.

After carefully considering the arguments of the parties, we agree with Mr. Graham that he was unfairly surprised by Dr. Hutt's testimony concerning the proper way for a radiologist to perform an arthrogram. We can find nothing in Dr. Wallace's pre-trial disclosures that puts Mr. Graham on notice that Dr. Hutt was going to opine as to the proper way for a radiologist to perform an arthrogram. Rather, the obvious import of Dr. Wallace's disclosures was that Dr. Hutt was going to testify as to the radiographic studies as these related to Dr. Wallace's diagnosis. Therefore, we agree with Mr. Graham that he was unfairly surprised by Dr. Hutt's testimony,[2] and that this testimony was irrelevant and prejudicial.

According to Rule 402 of the West Virginia Rules of Evidence, in part, "[e]vidence which is not relevant is not admissible." This is in line with this Court's holding in Syllabus Point 1 of *Smith v. Edward M. Rude Carrier Corp.,* 151 W.Va. 322, 151 S.E.2d 738 (1966) which states that "[e]vidence which is irrelevant or immaterial and has no probative value in determining any material issue is inadmissible and should be excluded." *See also, Ward v. Smith,* 140 W.Va. 791, 816, 86 S.E.2d 539, 552–53 (1955) ("Evidence which is irrelevant and immaterial to any issue in a case and which tends to confuse and mislead the jury is inadmissible

and should be excluded." (Citations omitted)). Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." W.Va.R.Evid. 401. This Court has recognized that,

> Under Rule 401, evidence having *any* probative value whatsoever can satisfy the relevancy definition. Obviously, this is a liberal standard favoring a broad policy of admissibility. For example, the offered evidence does not have to make the existence of a fact to be proved more probable than not or provide a sufficient basis for sending the issue to the jury.

*McDougal,* 193 W.Va. at 236, 455 S.E.2d at 795.

Dr. Hutt's testimony concerning the proper way to perform an arthrogram simply was not probative on the issue whether Dr. Wallace misread Dr. Raskin's arthrogram report. Dr. Raskin's report was clear on its face, and it indicated that the arthrogram was "unsuccessful." The report also stated, "TMJ arthrography with initial filling of the superior compartment[.]" Obviously, if Dr. Wallace read this report in any way other than to indicate that Dr. Raskin injected the superior compartment first and the arthrogram was unsuccessful, he misread the report. Therefore, Dr. Hutt's testimony simply did not make it any more or less likely that Dr. Wallace misinterpreted Dr. Raskin's report.

It has long been recognized by this Court that, "[a] judgment will not be reversed because of the admission of improper or irrelevant evidence, when it is clear that the verdict of the jury could not have been affected thereby." Syllabus Point 7, *Starcher v. South Penn Oil Co.,* 81 W.Va. 587, 95 S.E. 28 (1918). After considering Dr. Hutt's testimony in the context of the evidence heard at trial, it is not clear to this Court

---

2. In Syllabus 4 of *McDougal,* this Court held that "[i]n order to preserve for appeal the claim of unfair surprise as the basis for the exclusion of evidence, the aggrieved party must move for a continuance or recess." Mr. Graham did not move for a recess of the trial, however, he did make a contemporaneous objection to Dr. Hutt's

testimony and gave the trial judge the opportunity to either exclude the testimony or give a curative instruction. Under the specific facts of this case, this objection was more appropriate than asking for a recess. Therefore, we find that Mr. Graham properly preserved his objection for appeal.

that the jury's verdict could not have been affected by the testimony.

First, as we noted in *Graham v. Wallace I*, "[t]he instant case was clearly a close one—on liability, causation, and damages." 208 W.Va. at 143, 538 S.E.2d at 734. The close nature of the case presents a greater possibility that the injection of irrelevant evidence in the trial affected its outcome. Second, the question of the proper interpretation of the arthrogram was significant at trial. This is indicated by the fact that Dr. Wallace, Dr. Hutt, and Dr. Raskin all testified about it at some length. Third, Dr. Wallace's testimony on cross-examination concerning his reading of the arthrogram was confusing and equivocal.[3] If the jury had been able to evaluate Dr. Wallace's testimony in light of the express findings in Dr. Raskin's report, absent Dr. Hutt's irrelevant testimony, we are not convinced that it would have reached the same verdict.

Further, we believe that Dr. Hutt's testimony could have had a detrimental effect on Mr. Graham's case because of the nature of the case and the evidence presented. This is a medical malpractice case in which jurors were called upon to determine complicated questions of diagnosis and treatment with the necessary aid of expert witnesses. In this context, we believe that it was likely that irrelevant testimony by an expert witness beclouded or confused a significant issue to such an extent that the balance of the trial was unfairly tilted.

As noted above, Dr. Wallace urges that the issue whether he misread Dr. Raskin's report is itself immaterial since his findings during surgery confirmed his original diagnosis.

We disagree. Dr. Hutt's irrelevant testimony injected substantial confusion into the issue of Dr. Wallace's reading of the arthrogram. As aptly stated in Mr. Graham's brief, "Dr. Wallace was able to muddy the water with the patina of expert opinion." As a result, we believe that the jury may have been robbed of a fair opportunity to determine whether Dr. Wallace's reading of the arthrogram actually was immaterial in light of his subsequent findings, or, alternatively, that his negligent reading of the report did not cause any harm to Mr. Graham.

In closing, we emphasize that we have carefully considered all of Dr. Wallace's arguments. We also fully recognize that the trial judge did not enjoy our benefit of hindsight in assessing Dr. Hutt's testimony in the context of this hard-fought and closely-tried case. We must conclude, however, that fairness requires that the jury below be able to evaluate all of the relevant evidence untainted by confusing, prejudicial, and immaterial evidence.

## IV.

## CONCLUSION

For the reasons stated above, this case is reversed and remanded for a new trial.

Reversed and Remanded.

Justice DAVIS, deeming herself disqualified, did not participate in the decision in this case.

Judge JOHNSON, sitting by special assignment.

---

3. Dr. Wallace testified that he did not know whether Dr. Raskin injected the superior or the inferior compartment first, but he assumed that Dr. Raskin attempted to inject the inferior compartment. He further opined that the fact there was a small amount of contrast demonstrated in the superior compartment does not demonstrate a leak, or damage to the meniscus, because it only refers to one compartment. He added, however, that the fact that there was extravasation, or leakage into the muscle, following the second injection, "means that the dye that was injected into the space, was not being contained by the capsule and the meniscus, so it could go in different areas." Dr. Wallace later conceded, however, that this extravasation could mean one of two things—Dr. Raskin injected the proper area and it leaked, indicating damage to the meniscus, or Dr. Raskin missed the proper area and simply injected the dye into soft tissue. Dr. Wallace admitted that if the latter occurred, the study would be nondiagnostic. When confronted with the fact that Dr. Raskin's report clearly stated that the study was unsuccessful, Dr. Wallace testified, "[f]or the radiologist that was probably considered unsuccessful. For me, I saw in the examination and relied on to a certain extent that the dye leaked out of the capsule because of damage to the meniscus. I already knew his meniscus was not moving, so I didn't need that type of detail."

Justice ALBRIGHT concurs and reserves the right to file a concurring opinion.

Chief Justice STARCHER dissents and reserves the right to file a dissenting opinion.

Judge JOHNSON dissents and reserves the right to file a dissenting opinion.

STARCHER, Chief Justice, dissenting.

I dissent to the majority decision.

After the first trial of this case, a 3–2 majority of this Court reversed the first jury's verdict—which was for the patient, Mr. Graham.

The majority of this Court, in the first case, said that the oral surgeon, Dr. Wallace, did not get a fair chance to call rebuttal witnesses to counter a last-minute suggestion that Dr. Wallace had possibly manufactured documents. These documents related to when Dr. Wallace contacted Mr. Graham after the TMJ implants were recalled by the manufacturer. So the majority in the first case ordered a second trial.

I dissented to that decision, because Dr. Wallace explained the document issue to the jury, and I agreed with the trial judge that the jury had enough evidence to decide what did or did not happen about the documents.

I noted in my dissent in the first case that in trials, people are *always* claiming they need to put on rebuttal witnesses, basically so that they can get "the last word." But our law is that it is almost entirely up to a trial judge's discretion to deal with these rebuttal requests. In twenty years as a trial judge, I very rarely allowed rebuttal witnesses.

In other words, I thought the first trial was a fair trial, and the majority made a mistake to reverse a proper jury verdict.

Now, after a second trial, a second jury heard basically the same evidence—and ruled this time for the oral surgeon, Dr. Wallace. And again, I find myself dissenting. This time I again dissent to a 3–2 majority decision to reverse the second jury's verdict, and to grant yet a *third* trial.

This time the majority wants to overturn the jury's verdict because an expert witness for Dr. Wallace testified about an X-ray dye test that was done by a radiologist.

Mr. Graham's lawyer argued that this testimony was a complete surprise, and also that it was irrelevant and misleading. However, Dr. Wallace's lawyer said in advance of trial that his expert would testify about "radiographic studies," and no one disputes that "radiographic studies" included the dye tests. Moreover, Mr. Graham's lawyer asked the expert about the dye tests in a deposition before trial.

Did the lawyer ask enough questions? Perhaps not. But that is not Dr. Wallace's fault, and there was no unfair surprise.

The majority opinion argues that the expert's dye test evidence was entirely irrelevant, but it is somewhat hard to follow this argument, which makes me think that—as in the first trial of this case—the majority is again straining to find a reason to reverse a jury verdict.

As I see it, the expert explained why he thought the dye test evidence, although "inconclusive," was marginally useful. Mr. Graham's lawyer tried to make the expert look foolish before the jury (and did a pretty good job, too) for saying that Dr. Wallace could rely in any fashion on an "inconclusive" dye test. I think the jury got the point and was not misled about the dye test.

When it comes to the relevance of evidence like the expert and the dye test, this evidence is just like the rebuttal evidence in the first trial. That is, our law says that we ordinarily leave whether evidence has any relevance to the call of the trial judge, unless the judge's ruling is blatantly wrong. The trial court did not err, I think, in letting the expert say what he did.

Also, when Mr. Graham's lawyer raised this issue after trial, the judge decided that Mr. Graham had not made a persuasive case for a new trial based on this issue.

Our law again is that the trial judge ordinarily has the best opportunity to see and decide if these sorts of claimed errors about evidence are serious enough to require a new trial. Because the trial judge has the best opportunity, we give the judge's determination deference.

In this case, the judge decided that the jury had a good understanding of the evidence, and that Mr. Graham and Dr. Wallace had a fair chance to put on their cases. We should defer to the trial judge's opinion. Moreover, if we were to follow the position advocated by the majority, even though narrowly stated, it could be interpreted by some trial counsel as an opportunity to have a mini-trial each time an expert says something that is arguably outside of their Rule 26 disclosure statement. That is not a fair or sensible procedure, and it is certainly not the intent of the majority.

So—in the first case, I voted to uphold a jury's verdict *for the patient,* Mr. Graham. Then, in the second case, I voted to uphold a jury's verdict *for the oral surgeon,* Dr. Wallace.

The reader may ask, how could that be right? Which one should win? Who is right and who is wrong? It's a good question, and the answer is that our system *doesn't know who "should" win.*

Under our system, we have a *process* to handle these tough decisions, where people strongly disagree. We take these cases before a jury, and we have a fair trial, and then we live with the jury's verdict.

In very rare cases, where a jury's verdict is very clearly wrong, a judge has the power to correct it, and order the case to go before a new jury. But that is not what we have here. *Both of these juries were "right"—* because they both reached their verdicts after a fair trial.

However, in my judgment, the second trial never should have happened. (But my judgment was in the minority in the first case, which is also part of how our system works.)

Now, in the second case, my judgment is that the second jury verdict is the result with which we should live. (And again, my judgment is in the minority.)

At least I have been consistent—although I must say that fairness and compassion should always trump consistency.

For these reasons, I dissent. I would affirm the trial court's order refusing to grant a new trial. I am authorized to say that Judge Gary Johnson, sitting by temporary assignment, joins in this separate dissenting opinion.