# IN THE SUPREME COURT OF APPEALS OF WEST VIRGINIA

## January 2019 Term

**FILED**
**June 10, 2019**
released at 3:00 p.m.
EDYTHE NASH GAISER, CLERK
SUPREME COURT OF APPEALS
OF WEST VIRGINIA

No. 17-1086

### ROBERT SMITH,
### AS ADMINISTRATOR AND PERSONAL REPRESENTATIVE
### OF THE ESTATE OF A. S., DECEASED,
**Plaintiff Below, Petitioner**

**V.**

### CAROLYN CLARK, M.D. AND
### CABELL HUNTINGTON HOSPITAL, INC.,
**Defendants Below, Respondents**

_____

Appeal from the Circuit Court of Cabell County
The Honorable Gregory L. Howard, Judge
Civil Action No. 15-C-312

**AFFIRMED**
_____

Submitted: April 9, 2019
Filed: June10, 2019

Christopher J. Regan              D.C. Offutt, Jr.
Zachary J. Zatezalo               Ryan Q. Ashworth
Bordas & Bordas, PLLC             Offutt Nord Ashworth, PLLC
Wheeling, West Virginia           Huntington, West Virginia
Attorney for Petitioner           Attorneys for Carolyn Clark, M.D.

                                  Thomas L. Craig
                                  Rebecca C. Brown
                                  Ralph J. Hagy

**Bailes, Craig & Yon, PLLC**
**Huntington, West Virginia**
**Attorneys for Cabell Huntington**
**Hospital Inc.**

**JUSTICE JENKINS delivered the Opinion of the Court.**

**JUSTICE WORKMAN and JUSTICE HUTCHISON dissent and reserve the right to file dissenting opinions.**

**SYLLABUS BY THE COURT**

1.  "In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved." Syllabus point 5, *Orr v. Crowder*, 173 W. Va. 335, 315 S.E.2d 593 (1983).

2.  "In medical malpractice cases, the 'multiple methods of treatment' jury instruction (which states that a health care provider is not negligent if he or she selects and utilizes in a non-negligent manner one of two or more generally recognized methods of diagnosis or treatment within the standard of care) is appropriate where the evidence shows that the challenged method of diagnosis or treatment enjoys such substantial support within the medical community that it is, in fact, widely and generally recognized. The necessity of presenting evidence sufficient to support a multiple methods of [treatment] jury instruction rests with the defendant." Syllabus point 5, *Yates v. University of West Virginia Board of Trustees*, 209 W. Va. 487, 549 S.E.2d 681 (2001).

3.  "'A judgment will not be reversed because of the admission of improper or irrelevant evidence, when it is clear that the verdict of the jury could not have

been affected thereby.' Syllabus Point 7, *Starcher v. South Penn Oil Co.*, 81 W. Va. 587, 96 S.E. 28 (1918)." Syllabus point 3, *Graham v. Wallace*, 214 W. Va. 178, 588 S.E.2d 167 (2003).

4.      "The action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." Syllabus point 7, *State ex rel. Weirton Medical Center v. Mazzone*, 214 W. Va. 146, 587 S.E.2d 122 (2002) (internal quotations and citations omitted).

5.      "The West Virginia Rules of Evidence and the West Virginia Rules of Civil Procedure allocate significant discretion to the trial court in making evidentiary and procedural rulings. Thus, rulings on the admissibility of evidence . . . are committed to the discretion of the trial court. Absent a few exceptions, this Court will review evidentiary and procedural rulings of the circuit court under an abuse of discretion standard." Syllabus point 1, in part, *McDougal v. McCammon*, 193 W. Va. 229, 455 S.E.2d 788 (1995).

6.      "When a case involving conflicting testimony and circumstances has been fairly tried, under proper instructions, the verdict of the jury will not be set aside unless plainly contrary to the evidence or without sufficient evidence to support it." Syllabus point 9, *Neely v. Belk Inc.*, 222 W. Va. 560, 668 S.E.2d 189 (2008).

7.      "In determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved."  Syllabus point 10, *Neely v. Belk Inc.*, 222 W. Va. 560, 668 S.E.2d 189 (2008).


8.      "In determining whether the verdict of a jury is supported by the evidence, every reasonable and legitimate inference, fairly arising from the evidence in favor of the party for whom the verdict was returned, must be considered, and those facts, which the jury might properly find under the evidence, must be assumed as true."  Syllabus point 12, *Neely v. Belk Inc.*, 222 W. Va. 560, 668 S.E.2d 189 (2008).

**Jenkins, Justice:**

Petitioner Robert Smith ("Mr. Smith") herein appeals the November 17, 2017 order of the Circuit Court of Cabell County denying his motion for a new trial and renewed motion for judgment as a matter of law.[1] Mr. Smith alleges that the evidence at trial constituted a clear case of medical negligence and that certain trial errors circumvented the evidentiary process and forced a verdict against the weight of the evidence. Respondent Carolyn Clark, M.D. sets forth a cross-assignment of error,[2] arguing that the circuit court erred in denying her motion for judgment as a matter of law[3] because Mr. Smith's expert improperly invoked the "Locality Rule." Having considered the briefs submitted on appeal, the appendix record, the parties' oral arguments, and the applicable legal authority, we find no error. Accordingly, we affirm the order of the circuit court.

---

[1] In 1998, Rule 50 of the West Virginia Rules of Civil Procedure was revised. The changes abandoned the phrases "directed verdict" and "judgment notwithstanding the verdict." Rule 50 now refers to these as "judgment as a matter of law." Petitioner incorrectly referred to his motions below as "Motion for Judgment Notwithstanding the Verdict" and "Renewed Motion for Judgment Notwithstanding the Verdict." Because the correct phrase is "judgment as a matter of law," we will refer to the motions as such.

[2] *See* W. Va. R. App. P. 10(c)(10)(f) (providing for cross assignments of error by respondents).

[3] *See supra* note 1. Respondent Dr. Clark incorrectly referred to her motion below as "Motion for a Directed Verdict." Because the correct phrase is "judgment as a matter of law," we will refer to the motion as such.

# I.

## FACTUAL AND PROCEDURAL HISTORY

This matter appears before this Court upon the appeal of the plaintiff below and petitioner herein, Mr. Smith, as the Administrator and Personal Representative of the Estate of A. S. ("infant"). The Circuit Court of Cabell County denied Mr. Smith's post-trial motions—a motion for a new trial and a motion for judgment as a matter of law, based on his claims of trial error[4]—following a jury verdict for the defendants below.

On the morning of June 23, 2014, Carolyn Clark, M.D. ("Dr. Clark") induced Chasity Smith's ("Mrs. Smith") labor at Cabell Huntington Hospital, Inc. ("Cabell Huntington") in Huntington, West Virginia. According to the medical records, Mrs. Smith's labor was unremarkable, and the infant's fetal heart rate tracing remained in the normal range for much of the labor. At approximately 5:17 p.m., Dr. Clark inserted an intrauterine pressure catheter to check Mrs. Smith's contraction strength. Upon removal, the catheter returned blood. Dr. Clark then told the nursing staff to flush the blood from the catheter. At trial, it was not disputed that Mrs. Smith had suffered a placental abruption; however, Mr. Smith took the position that Dr. Clark caused the placental abruption by incorrectly inserting the catheter. To the contrary, Respondents used the testimony of expert pathologist, Dr. Carolyn Salafia, to explain how concealed placental abruptions can

---

[4] Each alleged trial error will be addressed separately in Section III Discussion. *See* Section III Discussion, *infra*.

occur spontaneously in the face of thrombophilia (a blood clotting abnormality), which Mrs. Smith experienced, and how abruptions relate to faster dilation.

Around 5:20 p.m., the infant's heartbeat showed an abnormal reading on the monitor. At trial, Mr. Smith argued that the infant's fetal heart tracing was lost. Conversely, Dr. Clark and Cabell Huntington (collectively "Respondents") countered that the movements were audible on the monitor. A few minutes later, a lower heartbeat was traced on the monitor and the nursing staff paged Dr. Clark for assistance. Around 5:33 p.m., Dr. Clark reviewed the infant's heartbeat. The nursing staff asked Dr. Clark if they were going to the operating room for a caesarean section—Dr. Clark did not respond.

At 5:37 p.m., Dr. Clark applied forceps in an attempt to deliver the baby vaginally. Although the medical chart is silent as to Mrs. Smith's labor progression at the exact time Dr. Clark began her attempt at vaginal delivery, the most progressed recorded dilation states that her cervix was dilated to 8-9 centimeters prior to any vaginal attempts at delivery. Mr. Smith argued at trial, that the silence in the medical record on dilation completeness meant that Mrs. Smith was never fully dilated and therefore was unable to deliver vaginally. Respondents disputed this contention. According to Dr. Clark and her expert, Dr. Frank Manning, dilation is progressive and exponential. In the words of Dr. Manning, dilation is "hard to get started and then it suddenly goes." The medical records in this case reveal that Mrs. Smith progressed in dilation quickly from six centimeters to nine centimeters. Therefore, Respondents maintained throughout the trial, that Mrs. Smith

was fully dilated and that Dr. Clark knew the position of the baby's head at all times during her attempt at a vaginal delivery. The nursing staff inquired once again about going to the operating room for a caesarean section. Instead, Dr. Clark prepared Mrs. Smith's bed, and put her in stirrups to prepare for a vaginal birth. After attempting a vaginal delivery with the assistance of forceps, Dr. Clark called for a caesarean section at approximately 5:54 p.m. At 6:04 p.m., the infant was born asphyxiated with Apgar scores of 0/0[5] and was immediately transferred to the newborn intensive care unit. The next day, life support was withdrawn and the infant was pronounced dead.

In November of 2015, Mr. Smith filed a medical professional liability action against Respondents. In his complaint, Mr. Smith alleged that Dr. Clark and Cabell Huntington were negligent and breached the applicable standards of care by failing to timely deliver the infant, thereby resulting in the infant's death. More specifically, Mr. Smith contended that fetal bradycardia[6] was documented in the medical record and the fetal

---

[5] "The Apgar score provides an accepted and convenient method for reporting the status of the newborn infant immediately after birth and the response to resuscitation if needed. The Apgar score alone cannot be considered to be evidence of or a consequence of asphyxia, does not predict individual neonatal mortality or neurologic outcome, and should not be used for that purpose. . . . This scoring system provided a standardized assessment for infants after delivery. The Apgar score comprises five components: 1) color, 2) heart rate, 3) reflexes, 4) muscle tone, and 5) respiration, each of which is given a score of 0, 1, or 2." The Apgar Score, Committee Opinion No. 644, American College of Obstetricians and Gynecology (Oct. 2015) (Reaffirmed 2019), *available at* THE AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS, http://www.acog.org/ (last visited May 9, 2019).

[6] According to ACOG, a fetus is considered to be experiencing bradycardia when the fetal heart rate baseline is less than 110 beats per minute. *See* Intrapartum Fetal

heart rate readings were classifiable as a Category 3 under the American College of Obstetricians and Gynecologists' ("ACOG") Fetal Heart Rate Monitoring protocol, which required immediate delivery by either operative vaginal delivery or caesarean section. Mr. Smith further alleged that Cabell Huntington's nurses breached the standard of care by failing to invoke the hospital's chain of command policy.[7]

The trial in this matter commenced on May 16, 2017, and lasted for eight days. While Mr. Smith furthered his theory that Dr. Clark breached the applicable standard of care by failing to more quickly deliver the infant in the face of fetal bradycardia, Dr. Clark presented rebuttal evidence—including her own testimony—to propound her position that Mrs. Smith was fully dilated at the time she attempted a forceps-assisted vaginal delivery, and therefore met the standard of care. Additionally, Cabell Huntington asserted that its nursing staff followed all hospital policies and procedures during the course of the infant's delivery, and, therefore, met the standard of care.

---

Heart Rate Monitoring: Nomenclature, Interpretation, and General Management Principles, Practice Bulletin No. 106, American College of Obstetricians and Gynecology (July 2009) (Reaffirmed 2017), *available at* THE AMERICAN COLLEGE OF OBSTETRICIANS AND GYNECOLOGISTS, http://www.acog.org/ (last visited May 22, 2019).

[7] In general, the Chain of Command policy is an organizational policy in place at hospitals that delineates a line of authority for nurses to contact when concerns with a patient's well-being arise. The Chain of Command policy exists to provide a resource for nurses to report their concerns up the chain of command until their concerns are alleviated. *See* Continuity of Care: NCLEX-RN, *available at* https://www.registerednursing.org/nclex/continuity-care/ (last visited May 23, 2019).

After the trial, the jury returned a verdict in favor of Dr. Clark and Cabell Huntington, finding that neither party breached their applicable standard of care. Because the jury determined that the applicable standard of care had not been breached, it rendered a defense verdict without the need to make a determination as to causation or damages. The circuit court entered its Final Judgment Order on June 6, 2017. On June 16, 2017, Mr. Smith renewed his previously filed motion for judgment as a matter of law under Rule 50(b)[8] of the West Virginia Rules of Civil Procedure, and also moved for a new trial under Rule 59.[9] Both of Mr. Smith's post-trial motions were denied in an order of the Circuit

---

[8] Rule 50 (b) of the West Virginia Rules of Civil Procedure states that

If, for any reason, the court does not grant a motion for judgment as a matter of law made at the close of all the evidence, the court is considered to have submitted the action to the jury subject to the court's later deciding the legal questions raised by the motion. The movant may renew the request for judgment as a matter of law by filing a motion no later than 10 days after entry of judgment and may alternatively request a new trial or join a motion for a new trial under Rule 59. In ruling on a renewed motion, the court may:

    (1) *If a verdict was returned:*
        A.    allow the judgment to stand,
        B.    order a new trial, or
        C.    direct entry of judgment as a matter of law; or

    (2) *if no verdict was returned:*
        A.    order a new trial, or
        B.    direct entry of judgment as a matter of law.

[9] Rule 59 of the West Virginia Rules of Civil Procedure states that

"[a] new trial may be granted to all or any of the parties and on all or part of the issues (1) in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law; and (2) in an action

6

Court of Cabell County dated November 12, 2017.  It is from this Order that Mr. Smith

now appeals.

## II.

## STANDARD OF REVIEW

This case comes to the Court after the circuit court denied Mr. Smith's post-

trial motion for a new trial and his renewed motion for judgment as a matter of law.  With

regard to our standard for reviewing a circuit court's ruling on a motion for a new trial, we

have explained that

> [a]s a general proposition, we review a circuit court's rulings
> on a motion for a new trial under an abuse of discretion
> standard. *In re State Public Building Asbestos Litigation*, 193
> W. Va. 119, 454 S.E.2d 413 (1994) (*Asbestos Litigation*).
> Thus, in reviewing challenges to findings and rulings made by
> a circuit court, we apply a two-pronged deferential standard of
> review.  We review the rulings of the circuit court concerning
> a new trial and its conclusion as to the existence of reversible
> error under an abuse of discretion standard, and we review the
> circuit court's underlying factual findings under a clearly
> erroneous standard.  Questions of law are subject to a *de novo*
> review.

> tried without a jury, for any of the reasons for which rehearings
> have heretofore been granted in suits in equity.  On a motion
> for a new trial in an action tried without a jury, the court may
> open the judgment if one has been entered, take additional
> testimony, amend findings of fact and conclusions of law or
> make new findings and conclusions, and direct the entry of a
> new judgment."

7

*Tennant v. Marion Health Care Found., Inc.*, 194 W. Va. 97, 104, 459 S.E.2d 374, 381 (1995).  It has also been noted that, "a new trial should not be granted unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done."  *McInarnay v. Hall*, 241 W. Va. 93, ___, 818 S.E.2d 919, 924 (2018) (internal quotation marks and citations omitted).

Further, "[t]he appellate standard of review for an order granting or denying a renewed motion for a judgment as a matter of law after trial pursuant to Rule 50(b) of the West Virginia Rules of Civil Procedure [1998] is de novo."  Syl. pt. 1, *Fredeking v. Tyler*, 224 W. Va. 1, 680 S.E.2d 16 (2009).  This Court has also stated that it

> reviews a trial court's order granting or denying a renewed motion for judgment as a matter of law after trial under Rule 50(b) of the *West Virginia Rules of Civil Procedure* [1998], it is not the task of this Court to review the facts to determine how it would have ruled on the evidence presented.  Instead, its task is to determine whether the evidence was such that a reasonable trier of fact might have reached the decision below.  Thus, when considering a ruling on a renewed motion for judgment as a matter of law after trial, the evidence must be viewed in the light most favorable to the nonmoving party.

Syl. pt. 2, *id.*

Each of the issues herein raised are addressed by this Court under slightly different standards of review.  Specifically, the assignments of error analyzed in Discussion Sections "A" through "E" are reviewed for an abuse of discretion.  Further, relating to the assignment of error examined in Discussion Section "F,"

8

> [i]n determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.

Syl. pt. 5, *Orr v. Crowder*, 173 W. Va. 335, 315 S.E.2d 593 (1983). Accordingly, we now proceed to consider the parties' arguments.

## III.

## DISCUSSION

In his brief, Mr. Smith raises nine separate assignments of error. Each issue will be addressed in turn.

### A. Jury Instructions

Mr. Smith argues that certain jury instructions *should not have* been given by the circuit court, and, likewise, that other instructions *should have* been given to the jury. First, he states that the circuit court erred by giving the "multiple methods of treatment" instruction. Second, he asserts that the circuit court erred when it refused to instruct the jury on the "eggshell plaintiff" instruction. After identifying the appropriate standards of review for these particular issues, we will address each of these assignments of error separately.

9

This Court has observed that

> [t]he formulation of jury instructions is within the broad discretion of a circuit court, and a circuit court's giving of an instruction is reviewed under an abuse of discretion standard. A verdict should not be disturbed based on the formulation of the language of the jury instructions so long as the instructions given as a whole are accurate and fair to both parties.

Syl. pt. 6, *Tennant v. Marion Health Care Found., Inc.*, 194 W. Va. 97, 459 S.E.2d 374 (1995).

Further, "[i]t will be presumed that a trial court acted correctly in giving or in refusing to give instructions to the jury, unless it appears from the record in the case that the instructions were prejudicially erroneous or that the instructions refused were correct and should have been given." Syl. pt. 1, *State v. Turner*, 137 W. Va. 122, 70 S.E.2d 249 (1952). Moreover, we observed in Syllabus point 4 of *State v. Guthrie*, 194 W. Va. 657, 461 S.E.2d 163 (1995):

> A trial court's instructions to the jury must be a correct statement of the law and supported by the evidence. Jury instructions are reviewed by determining whether the charge, reviewed as a whole, sufficiently instructed the jury so they understood the issues involved and were not misle[d] by the law. A jury instruction cannot be dissected on appeal; instead, the entire instruction is looked at when determining its accuracy. A trial court, therefore, has broad discretion in formulating its charge to the jury, so long as the charge accurately reflects the law. Deference is given to a trial court's discretion concerning the specific wording of the instruction, and the precise extent and character of any specific instruction will be reviewed only for an abuse of discretion.

**1.** **"Multiple Methods of Treatment" Instruction.** Mr. Smith first contends that the jury was misled by the circuit court's inclusion of the "multiple methods of treatment" instruction. Specifically, Mr. Smith contends that the circuit court acted under a misapprehension of the law and erred by giving a "multiple methods of treatment" instruction where the only liability issue for determination involved the timing of the infant's delivery. The instruction, as read to the jury, stated:

> Sometimes the standard of care for treating a patient involves consideration of different methods of diagnosis or treatment that are widely and generally recognized within the medical community.
>
> A healthcare provider must use its professional judgment in choosing what it believes to be the most effective treatment option in a given situation. Just because a healthcare provider chooses one recognized method of treatment instead of another does not mean it breached the standard of care. A healthcare provider is not negligent if it selects and utilizes, in a non[-]negligent manner, one of two or more generally recognized methods of treatment within the standard of care.
>
> However, a healthcare provider that uses a widely and generally recognized method of treatment or diagnosis must utilize the method with the degree of care, skill, and learning that would be provided by a reasonable and prudent healthcare provider in the same or similar circumstances.

This Court has previously had the occasion to discuss the propriety of the "multiple methods of treatment" instruction in *Yates v. University of West Virginia Board of Trustees*, 209 W. Va. 487, 549 S.E.2d 681 (2001). In *Yates,* we held that

> [i]n medical malpractice cases, the "multiple methods of treatment" jury instruction (which states that a health care

11

provider is not negligent if he or she selects and utilizes in a non-negligent manner one of two or more generally recognized methods of diagnosis or treatment within the standard of care) is appropriate where the evidence shows that the challenged method of diagnosis or treatment enjoys such substantial support within the medical community that it is, in fact, widely and generally recognized. The necessity of presenting evidence sufficient to support a multiple methods of [treatment] jury instruction rests with the defendant.

Syl. pt. 5, *id.* When offering this instruction to a jury,

[i]t is insufficient to show that there exists only a small minority of physicians who agree with the defendant's challenged treatment. On the other hand, it is not necessary for the defendant to show that the challenged treatment is utilized by the majority of physicians. Rather, the defendant must show that the challenged treatment enjoys such substantial support within the medical community that it truly is *generally* recognized. In order to make this showing, the defendant's expert must opine that the challenged method of diagnosis or treatment has substantial support and is generally recognized within the medical community. This testimony should usually be supported by sufficient extrinsic evidence such as medical textbooks, treatises, journal articles, or other similar evidence. Upon a proper showing by the defendant, a multiple methods of treatment instruction may properly be given. Once the trial court makes this determination, it is ultimately a question for the jury to determine whether it believes that the challenged method of diagnosis or treatment is generally recognized, and the burden of persuasion on that issue remains with the plaintiff.

*Id.* at 495-96, 549 S.E.2d at 689-90.

It is Mr. Smith's contention that this instruction ignored the issue of "timing" and essentially informed the jury that a physician is not negligent when he or she performs one or more approved methods of treatment within the standard of care. Mr. Smith maintains that the issue for jury determination had nothing to do with Dr. Clark's choice

12

of delivery method, but instead, the issue had everything to do with the timing of the infant's delivery, and therefore the instruction does nothing but provide confusion for the jury. Additionally, Mr. Smith cites to *Yates* for the proposition that Respondents failed to submit extrinsic evidence supportive of a "multiple methods" instruction.

In their respective briefs, Dr. Clark and Cabell Huntington reject this notion and emphasize that the "timing of delivery" theory is simply inaccurate. According to the Respondents, this case has never been about "timing," and has always been about Dr. Clark and her choice to attempt a vaginal delivery versus a caesarean section once Mrs. Smith was fully dilated. Moreover, in its order denying all post-trial motions, the circuit court explained, "that sufficient evidence was presented to support a finding that Mrs. Smith was completely dilated at the time Dr. Clark attempted vaginal delivery. Therefore, the evidence submitted at trial also warranted the 'multiple method instruction.'"

Respondents rebut that not only was the "multiple methods of treatment" instruction appropriate, but also necessary. They argue, that although Mr. Smith characterizes his argument as a "timing" issue, Mr. Smith's real argument boils down to the method of delivery: vaginal versus caesarean. In the case at hand, this Court must recognize that it was Mr. Smith who first triggered the issue of the "multiple methods of treatment" when his Complaint and expert witness both asserted that delivery of the infant

13

was necessary by <u>either</u> vaginal delivery or caesarean section.[10] In particular, Mr. Smith's expert stated that vaginal delivery is an accepted method of childbirth, and that if a patient is fully dilated, it is often faster than performing caesarean sections. Specifically, Mr. Smith's expert testified:

> Now, [the American College of Obstetricians and Gynecologists] doesn't say whether you do a vaginal delivery or whether you do a C-section. But, obviously, it depends upon where you are in your labor. If someone is completely dilated and the head is low down and right there, it's sometimes faster to do a vaginal delivery than a C-section.
>
> . . .
>
> But again, if you are expecting me to assume that she's complete [fully dilated], you're also saying if it's going to be quickly, you're assuming that [the baby is] well down, which means it's already rotated, otherwise it wouldn't be well down, and if all of those happen in that situation, and I check her and, you know, she's 3/4 - plus 3/4 no, <u>I would have no problem with that</u>. But that I don't think is what happened. It's going to be left to them [referring to the jury].

As explained above in the expert's testimony, Mr. Smith's "timing" argument assumes that Mrs. Smith was incomplete (not fully dilated) when Dr. Clark attempted a vaginal delivery. However, Respondents put forth their own expert witnesses and testimony from Dr. Clark herself to prove that Mrs. Smith was complete at the time vaginal delivery was attempted. In fact, the circuit court found that Respondents put forth

_____

[10] *See* Complaint, at ¶ 16 ("By 5:35, fetal bradycardia was documented and the fetal heart rate readings were classifiable as a Category 3 under the ACOG Fetal Heart Rate Monitoring protocol, which required immediate delivery by either operative vaginal delivery or caesarean section.").

14

the following evidence to support their theory that Mrs. Smith was fully dilated and ready for a vaginal childbirth: (1) experts testified that that process of dilation is progressive and exponential; (2) experts testified that placental abruptions cause faster dilation; (3) Dr. Clark knew the position of the infant's head; (4) Dr. Clark was able to place forceps through the cervix which would have been difficult if the cervix was not fully dilated; and (5) Dr. Clark, an obstetrician and gynecologist with forty years of experience, testified that Mrs. Smith was fully dilated. In addition to the substantial evidence put forth to support the giving of the instruction, the circuit court also found that "the jury instructions as a whole were 'accurate and fair to both parties.'" We agree.

Because we find that the jury instructions were fair and accurate to all parties, we must disagree with Mr. Smith's contention that the "multiple methods of treatment" instruction misled the jury and caused them to find in Dr. Clark's favor simply because she chose a vaginal delivery (which is an accepted and recognized method of delivering children). It was undisputed that Mrs. Smith had suffered a placental abruption that compromised the infant; however, the difficulty of Mrs. Smith's labor does not change the fact that sufficient evidence was put forth to show that she was fully dilated, and that Dr. Clark had a choice between delivery methods. Here, we find that ample evidence—offered by all parties at trial—warranted the "multiple methods of treatment" instruction. As the circuit court noted in its Order: "The evidence submitted by Plaintiff [Mr. Smith] and Defendants [Dr. Clark and Cabell Huntington] confirmed that two methods of childbirth

15

enjoy substantial support within the medical community, those being vaginal delivery or caesarean delivery."

Here, the "multiple methods of treatment" instruction advised the jury that there is not just one recognized method of delivery of a child, and as such, the circuit court did not abuse its discretion by giving this instruction. While Mr. Smith may not agree because, in his view, the instruction ignored his "timing" theory of the case, we are not persuaded that the instruction was unfair. The circuit court found that Mrs. Smith was fully dilated at the time a vaginal delivery was attempted, which enabled Dr. Clark to choose the method of delivery. In light of this, and all of the evidence presented at trial, we find that the circuit court's factual finding is not clearly erroneous.[11] Additionally, Mr. Smith alleged in his own complaint, that both vaginal and caesarean sections were available means to deliver the infant.[12] As such, we find no error as the evidence before the jury supported such an instruction.

**2.** **"Eggshell Plaintiff" Instruction.** Mr. Smith contends that the circuit court committed reversible error by refusing to give an "eggshell plaintiff" instruction. Specifically, Mr. Smith requested that the following instruction be submitted to the jury:

---

[11] *See Tennant v. Marion Health Care Found., Inc.*, 194 W. Va. 97, 104, 459 S.E.2d 374, 381 (1995) (on review of a motion for new trial, factual findings underlying rulings of the circuit court are reviewed for clear error).

[12] *See supra* note 10.

If you find that [the infant] was more susceptible to injury than a normal person, you may still award damages to Robert Smith for the injuries caused by the Defendants even if a normal healthy person would not have suffered similar injury.[13]

(Footnote added). The circuit court found that the "jury was fully instructed on all principles that applied to the case and the refusal of this instruction did not impede Plaintiff's closing argument or foreclose the jury's passing on the Plaintiff's basic theory of the case as developed through the evidence." Mr. Smith argues that the jury should have been instructed that Mrs. Smith had prior bleeding and possible genetic conditions that made the infant less likely to survive the acute placental abruption, and that the Respondents could be held liable for injuries in spite of the infant's weakened condition. According to Mr. Smith, the absence of the "eggshell plaintiff" instruction further confused and misled the jury and significantly prejudiced his right to a fair trial. Respondents rebut Mr. Smith's assertion and argues that the failure to give the "eggshell plaintiff" instruction did not affect the outcome of the case since the jury never reached a determination as to causation or damages. We agree with Respondents.

The decision of the circuit court to forego giving an "eggshell plaintiff" instruction did not affect the outcome of the trial. The "eggshell plaintiff" instruction necessarily relates to the issue of causation. In both *Shia v. Chvasta*, 180 W. Va. 510, 377

---

[13] This instruction, as written above, is only part of the *West Virginia Pattern Jury Instructions for Civil Cases* colloquially known as the "eggshell plaintiff" or "thin skull" instruction. *See* Menis E. Ketchum, *West Virginia Pattern Jury Instructions for Civil Cases* §802 Personal Injury, Wrongful Death & Property Damage (2016).

17

S.E.2d 644 (1988) and *Howe v. Thompson*, 186 W. Va. 214, 412 S.E.2d 212 (1991), we discussed the proffered "eggshell instruction" in the context of proximate cause, and found that the circuit courts did not err by rejecting the instruction.[14] Here, the jury rendered a verdict on liability and found that neither Dr. Clark nor Cabell Huntington breached the standard of care. The jury's deliberations ended there, and the jury did not reach the issue of proximate cause. Thus, this question of causation would only be relevant if Mr. Smith had prevailed on the issue of liability. As such, we find that the refusal to give the "eggshell plaintiff" instruction had no effect on the outcome of this case because the jury found that the Respondents were not liable for the infant's injuries.[15]

After reviewing the jury instructions as a whole, we do not find error in excluding the proposed jury instruction. As the circuit court correctly found, the jury was fully instructed on all principles applicable to this matter, and the omission of the "eggshell plaintiff" instruction did not impede the jury's ultimate determination. Most importantly, the "eggshell plaintiff" instruction directly relates to the issue of causation and damages, and once again, the jury in this case never reached a determination as to causation or

---

[14] *Accord Primm v. U.S. Fidelity & Guar. Ins. Corp.*, 324 Ark. 409, 922 S.W.2d 319 (1996); *Benn v. Thomas*, 512 N.W.2d 537 (Iowa 1994).

[15] Although West Virginia cases discuss the "eggshell plaintiff" instruction in the context of proximate cause, the "eggshell plaintiff" instruction is often included in the "Damages" section of pattern jury instructions. Therefore, because the jury also did not reach the issue of damages, the circuit court's refusal to give the "eggshell plaintiff" instruction was equally proper on this basis.

18

damages as this was a defense verdict on standard of care. Therefore, we do not find an abuse of discretion in refusing to give this instruction to the jury.

## B. Expert Witnesses

Next, Mr. Smith argues that the circuit court erred in allowing certain expert witnesses to testify, and also by excluding other expert witnesses. First, Mr. Smith contends that the circuit court erred by allowing the testimony of Respondents' placental expert, Carolyn Salafia, M.D. Then, he asserts that the circuit erred when it struck his nursing expert, Patricia Spier, R.N. Finally, he argues that the circuit court erred in limiting the number of expert witnesses, by excluding the testimony of his expert, Dr. Bruce Ratliff. After setting out the appropriate standard of review for these particular issues, we will address each of these assignments of error in turn.

When addressing a circuit court's decision whether to allow expert witness testimony during a trial, this Court has held: "The admissibility of testimony by an expert witness is a matter within the sound discretion of the trial court, and the trial court's decision will not be reversed unless it is clearly wrong." Syl. pt. 6, *Helmick v. Potomac Edison Co.,* 185 W. Va. 269, 406 S.E.2d 700 (1991), *cert. denied,* 502 U.S. 908, 112 S. Ct. 301, 116 L. Ed. 2d 244 (1991).

**1.    Testimony of Placental Pathologist Carolyn Salafia, M.D.** Carolyn Salafia, M.D. ("Dr. Salafia") was disclosed by Respondents as an expert in placental

19

pathology. At trial, she was called to offer testimony on placental abruptions, her examination of the pathology specimens in the present case, and the effect the placental abruption and Mrs. Smith's prior health issues had on delivering a viable baby in distress. The circuit court found that Dr. Salafia's testimony was highly relevant, not unduly prejudicial, and was properly admitted at trial. Specifically, the circuit court noted, "Dr. Salafia's testimony was necessary to explain the evidence in this case, including the cause of Mrs. Smith's placental abruption and the laboratory findings of an anemic hematocrit and an elevated red blood cell count." The circuit court also permitted Mr. Smith to call a rebuttal placental pathologist—he did not.

On appeal, Mr. Smith alleges that the circuit court erred in failing to exclude the testimony of Dr. Salafia where it failed to offer any causal nexus between her interpretation of the placental pathology findings and the timing of the infant's delivery. In particular, Mr. Smith states that Dr. Salafia's testimony about Mrs. Smith's placental abruption unfairly caused speculation that the infant was going to die regardless of when or how Dr. Clark performed the delivery. He further contends that Dr. Salafia's testimony regarding placental abruptions was irrelevant and should not have been permitted at trial. He then argues that Dr. Salafia's lengthy testimony concerning the fatal "acute placental abruption" had no connection to the issues in the case, and simply did not make it any more or less likely that the infant would have survived had she been delivered sooner. Respondents counter this assertion and note that, without Dr. Salafia's testimony, the jury would have inferred that Dr. Clark caused the placental abruption when she inserted the

20

intrauterine catheter. Respondents contend that Dr. Salafia—a board-certified and fellowship-trained placental pathologist—offered highly relevant, informative testimony that was not duplicative or cumulative.

We find that the circuit court was correct in allowing the testimony of Dr. Salafia. Rule 702 (a) of the West Virginia Rules of Evidence states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise." *See, e.g.*, *Cargill v. Balloon Works, Inc.*, 185 W. Va. 142, 405 S.E.2d 642 (1991); *Jones v. Garnes*, 183 W. Va. 304, 395 S.E.2d 548 (1990); *Bd. of Educ. of McDowell County v. Zando, Martin & Milstead, Inc.*, 182 W. Va. 597, 390 S.E.2d 796 (1990); *W. Va. Dept. of Highways v. Thompson*, 180 W. Va. 114, 375 S.E.2d 585 (1988). Here, the circuit court determined that Dr. Salafia's opinions would assist the jury in determining a fact at issue, namely, whether Dr. Clark caused the placental abruption when she inserted the intrauterine catheter. Because the circuit court found Dr. Salafia's testimony would help the jury understand the evidence, it was well within its discretion to admit her testimony.

Alternatively, it is important to note that the jury never reached a determination on causation since a defense verdict was returned on the issue of standard of care. Dr. Salafia was offered by the Respondents for the limited purpose of giving opinions

21

related to causation. Dr. Salafia was not Respondents' standard of care expert witness. Here, the jury had to resolve the issue of whether Dr. Clark and Cabell Huntington breached the standard of care, and if they did, whether their negligence caused the injuries suffered by Mr. Smith and his family. In this case, the jury's verdict did not turn on the evidence presented by Dr. Salafia, because the jury found that Respondents did not breach the standard of care. As this Court has held, "[a] judgment will not be reversed because of the admission of improper or irrelevant evidence, when it is clear that the verdict of the jury could not have been affected thereby." Syl. pt. 3, *Graham v. Wallace*, 214 W. Va. 178, 588 S.E.2d 167 (2003) (quoting Syl. pt. 7, *Starcher v. South Penn Oil Co.*, 81 W. Va. 587, 95 S.E. 28 (1918)). Because Dr. Salafia's testimony related to issues of causation, it did not affect the jury because the jury never reached the element of causation.

In the present case, it is undisputed that Mrs. Smith suffered a concealed placental abruption contemporaneous with labor, and Dr. Salafia's testimony was needed to explain the evidence in this case. Mr. Smith took the position that Dr. Clark caused the placental abruption by incorrectly inserting an intrauterine pressure catheter during Mrs. Smith's labor and delivery. For that reason, we find that Dr. Salafia's testimony was necessary for rebuttal, and to explain how the placenta functions and how a concealed abruption can occur in the face of thrombophilia (a blood clotting abnormality) or some other natural cause. Because of this, it is clear that Dr. Salafia's testimony was vitally important to rebut Mr. Smith's contention that Dr. Clark caused the placental abruption

22

with a medical device. For these reasons, we do not find error with the circuit court allowing Dr. Salafia's testimony at trial.

**2.    Striking Nursing Expert Patricia Spier, R.N.** Mr. Smith next contends that the circuit court erred by striking his nursing expert, Patricia Spier, R.N. ("Nurse Spier"). Before the trial, the circuit court ruled that each party be permitted only *one* expert on standard of care for each specialty (i.e. one expert to testify on the standard of care for physicians, and one expert to testify on the standard of care for nurses). At trial, Mr. Smith's physician expert, Dr. Richard Roberts, testified during his direct examination that the labor and delivery nurses at Cabell Huntington breached the standard of care when caring for Mrs. Smith.

> MR. REGAN: Based on your review of the medical record in this case, Doctor, what conclusions have you formed?
>
> DR. ROBERTS: Well, my opinion is that the care she received on the day of her delivery did not adhere to an acceptable level of care expected both as an obstetrician as well as the nursing staff at Cabell Huntington.

Cabell Huntington's attorneys objected, and argued that because Dr. Roberts offered an opinion with regard to the nursing staff, Nurse Spier's testimony would likely be duplicative. After this objection, the matter went to sidebar where Cabell Huntington's counsel moved to strike Mr. Smith's nursing expert, Nurse Spier—as said testimony would be duplicative of Dr. Roberts' testimony.

The jury was dismissed and counsel approached the bench where an in-depth discussion with the judge was had. During this discussion, Mr. Smith's counsel was asked whether a limiting instruction should be given or whether striking the expert would be more appropriate. After asking the court to give a limiting instruction, counsel agreed that Dr. Roberts was qualified and capable of offering an opinion with regard to the nursing staff.[16]

> MR. REGAN: Your Honor, the plaintiff would intend to offer Dr. Roberts only on the medical standard of care as to the defendant doctor, and would suggest that the jury be instructed to disregard the statement about the hospital because that's for another witness. And the [sic] Dr. Roberts will only be speaking about the doctor going forward.
>
> If that's not acceptable to the defendants, then Dr. Roberts is qualified and capable of covering both, and he could do that.

Mr. Smith's counsel also acknowledged that, although counsel preferred a limiting instruction, it recognized that it was ultimately in the discretion of the court to decide.

> MR. REGAN: I mean, again, that was not our plan. We have a Nurse Spier on the way to cover those matters. So, I mean, we would strongly prefer that a curative instruction be given, the plaintiffs be allowed to proceed with one expert on the issue of medicine, one on the issue of nursing. But, you know, that is in the discretion of the Court.

Ordinarily, "[a] litigant may not silently acquiesce to an alleged error, or actively contribute to such error, and then raise that error as a reason for reversal on appeal." Syl. pt. 1, *Maples v. W. Va. Dep't of Comm.*, 197 W. Va. 318, 475 S.E.2d 410

---

[16] It should be noted that after the circuit court decided to strike Nurse Spier, Dr. Roberts was direct examined by Mr. Smith's counsel, where he was given an opportunity to offer his standard of care opinions on the nursing staff at Cabell Huntington and was cross-examined by counsel for Cabell Huntington.

24

(1996). *See also Hopkins v. DC Chapman Ventures, Inc.*, 228 W. Va. 213, 719 S.E.2d 381 (2011) (same); *State v. Carey,* 210 W. Va. 651, 558 S.E.2d 650 (2001) (same); *State v. McIntosh,* 207 W. Va. 561, 534 S.E.2d 757 (2000) (same). We find that when Mr. Smith's counsel deferred to the court's discretion on how to handle Nurse Spier, counsel essentially yielded their position and allowed the court to deal with the issue as necessary. Specifically, during sidebar, Mr. Smith's counsel conceded that Dr. Roberts was more than qualified to offer an opinion regarding the nursing staff. As such, we find no abuse of discretion.

Moreover, it is well established that "once an expert witness is permitted to testify, it is within the province of the jury to evaluate his or her testimony, credentials, background and qualifications." *Graham v. Wallace*, 208 W. Va. 139, 141, 538 S.E.2d 730, 732 (2000) (citing *Wilkinson v. Bowser*, 199 W. Va. 92, 96 n. 5, 483 S.E.2d 92, 96 n. 5 (1996)). "A party challenging a circuit court's evidentiary rulings has an onerous burden because a reviewing court gives special deference to the evidentiary rulings of a circuit court." *Gentry v. Mangum*, 195 W. Va. 512, 518, 466 S.E.2d 171, 177 (1995). Here, the circuit court ultimately determined that allowing Nurse Spier to testify would be cumulative and prejudicial to the other parties who were only allowed one standard of care expert. Mr. Smith now complains on appeal that Respondents honed in on Dr. Roberts' lack of nursing qualifications on cross-examination and thereby prejudiced his client.

25

This Court has previously held that "[t]he action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." Syl. pt. 7, *State ex rel. Weirton Med. Ctr. v. Mazzone*, 214 W. Va. 146, 587 S.E.2d 122 (2002) (internal quotations and citations omitted). Here, the circuit court was adamant that each party be limited to one standard of care expert. Once Dr. Roberts—a qualified physician—opined about the nursing staff and their standard of care, the opinion could not be taken back, but a limiting instruction could have been given. The circuit court rationalized that if the court had allowed Nurse Spier to testify, Mr. Smith would have unfairly benefitted from having two qualified experts opining as to the nursing staff at Cabell Huntington. Rather than allow duplicative testimony, the court—within its discretion—decided to strike Nurse Spier as an expert. As the circuit court noted, like a bell that has been rung, the jury heard Dr. Roberts' criticism of the nursing staff, and no curative instruction could change the effect on the jurors. Therefore, we find no error in the circuit court's decision to strike Nurse Spier.

3.      **Excluding Dr. Bruce Ratcliff as an Expert Witness.** Mr. Smith next asserts error in the circuit court's decision to prohibit him from offering Dr. Bruce Ratcliff as a second standard of care expert witness at trial where the trial court permitted both Dr. Clark and the expert retained by the Respondents to opine about the standard of care. In other words, Mr. Smith contends that the court committed reversible error because

he was limited to one expert on the standard of care whereas Respondents essentially had two experts: Dr. Clark, herself, and Dr. Manning, their standard of care expert witness.

In October of 2015, Mr. Smith timely disclosed his experts: Dr. Roberts, as a standard of care and causation expert; and Nurse Patricia Spier, as a nursing standard of care expert. Fourteen months after the expert disclosure deadline, Mr. Smith disclosed Dr. Bruce Ratcliff, the chief of obstetrics at Cabell Huntington, and a long-time colleague of Dr. Clark. Respondents moved to strike and exclude Dr. Ratcliff as untimely, cumulative, and unfairly prejudicial. By agreed order, the circuit court ruled that Mr. Smith needed to choose one expert to testify as to the standard of care with regard to Dr. Clark, and one expert with regard to Cabell Huntington's nursing staff. Ultimately, Mr. Smith chose Dr. Roberts and Nurse Spier, respectively, as his standard of care experts.

With regard to limiting the number of experts, this Court has repeatedly held that courts have wide authority to do so.

> This Court has held that "'"[t]he action of a trial court in admitting or excluding evidence in the exercise of its discretion will not be disturbed by the appellate court unless it appears that such action amounts to an abuse of discretion." Syl. pt. 5, *Casto v. Martin,* 159 W. Va. 761, 230 S.E.2d 722 (1976) citing Syl. pt. 10, *State v. Huffman,* 141 W. Va. 55, 87 S.E.2d 541 (1955).' Syllabus Point 2, *State v. Rector,* 167 W. Va. 748, 280 S.E.2d 597 (1981)." Syllabus Point 3, *State v. Oldaker,* 172 W.Va. 258, 304 S.E.2d 843 (1983).

*Mazzone*, 214 W. Va. at 154, 587 S.E.2d at 130. Even more, in *Mazzone* this Court noted:

> It is apparent that the circuit court felt that a ruling limiting the number of experts that would be permitted to testify at trial was needed because of the excessive number of witnesses

27

identified by the petitioners.  The court obviously sought to prevent duplicative and cumulative testimony.  Such a ruling is certainly permitted and appropriate under the circumstances.

*Id.* at 154-55, 587 S.E.2d at 130-31.  However, in addition to recognizing the authority of a circuit court to limit the number of expert witnesses, the Court also emphasized the difference between a defendant/physician and a retained expert/physician.  Although some aspects of a defendant/physician and a retained expert/physician's testimony is inexplicably intertwined, a defendant/physician is essentially testifying on his or her own behalf, and the testimony is often seen as self-serving.  As such, if a defendant/physician chooses to testify, he or she opens himself or herself up to cross-examination by opposing counsel.  This Court addressed the issue, and specifically noted that

> [w]hile a defendant physician can certainly give testimony as an expert witness on his own behalf, *see* 32 C.J.S. *Evidence* § 637 (1996), we believe that it would be unduly harsh and restrictive to prohibit that same defendant physician from presenting the testimony of an independently-retained expert on the basis that the testimony would be cumulative.  A medical malpractice case presents a unique situation wherein the testimony of a defendant physician often qualifies as expert testimony even when he or she only intends to testify as a fact witness.  In that regard, a defendant physician cannot usually explain his or her conduct without giving some testimony that is expert in nature.

*Id.* at 155, 587 S.E.2d at 131.

Here, all parties had an opportunity to disclose their experts in accordance with the Scheduling Order.  Early on in the litigation, the circuit court deemed that having too many expert witnesses would have caused the focus of the case to be upon the quantity,

28

and not the quality of the expert testimony.[17]  As such, the court took a stance early to limit experts in this matter to prevent duplicative and cumulative testimony.  Once asked by the court to choose one standard of care expert as to Dr. Clark, *Mr. Smith chose Dr. Roberts, not Dr. Ratcliff.*  Therefore, the circuit court did not *strike* or *preclude* Dr. Ratcliff.  Rather, the circuit court properly exercised its authority to instruct the parties to limit the number of standard of care experts who would be called to testify.  We find there was no error committed when the trial court limited the number of experts in this matter.

### C. Dr. Clark's Prior Testimony

Mr. Smith next contends that the circuit court erred in excluding Dr. Clark's testimony from a prior lawsuit by way of a pretrial ruling on a Rule 404(b) motion *in limine*.  This excluded evidence pertained to Dr. Clark's prior testimony in which she *discounted the value* of certain *American College of Obstetricians and Gynecologists* ("ACOG") standards while testifying in a previous lawsuit.  Mr. Smith complains that in the current lawsuit, Dr. Clark was permitted to testify in which she *vouched for the authority* of ACOG standards in the instant matter.  In his brief, Mr. Smith asserts that the testimony was relevant as a tool of impeachment and as a way of illustrating her contradictory statements.  Respondents contend that the excluded ACOG testimony dealt with breech births—which is not at issue in this case—and therefore would not be contradictory, but rather would be

---

[17] In his brief, Mr. Smith did not object to the circuit court's authority to limit the number of experts; rather, Mr. Smith's argument focused on the fact that both Dr. Clark *and* her retained expert were allowed to opine that Dr. Clark met the standard of care.

irrelevant, prejudicial, and would potentially be used to bring out information regarding Dr. Clark's litigation history.

Prior to trial, Respondents timely moved, *in limine* and pursuant to West Virginia Rules of Evidence 401, 402, 403, and 404, to exclude any evidence, testimony or reference at trial to any prior lawsuits involving Dr. Clark. In response, Mr. Smith filed a notice of intent to use 404(b) evidence at trial, but the court denied Mr. Smith's request. We agree with the ruling of the circuit court to exclude this evidence.

This court has held that "[a] trial court's evidentiary rulings, as well as its application of the Rules of Evidence, are subject to a review under an abuse of discretion standard." Syl. pt. 4, *State v. Rodoussakis*, 204 W. Va. 58, 511 S.E.2d 469 (1998). "Our function . . . is limited to the inquiry as to whether the trial court acted in a way that was so arbitrary and irrational that it can be said to have abused its discretion." *State v. McGinnis*, 193 W. Va. 147, 159, 455 S.E.2d 516, 528 (1994).

In Syllabus point 8 of *TXO Production Corp. v. Alliances Resources Corp.,* 187 W. Va. 457, 419 S.E.2d 870 (1992), this Court held:

> Protection against unfair prejudice from evidence admitted under Rule 404(b) of the *West Virginia Rules of Evidence* [1985] is provided by: (1) the requirement of Rule 404(b) that the evidence be offered for a proper purpose; (2) the relevancy requirement of Rule 402—as enforced through Rule 104(b); (3) the assessment the trial court must make under Rule 403 to determine whether the probative value of the

30

similar acts evidence is substantially outweighed by its potential for unfair prejudice; and, (4) Rule 105, which provides that the trial court shall, upon request, instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted.

Here, Mr. Smith argues that he should have been allowed to use Dr. Clark's prior testimony regarding an ACOG bulletin as a way of impeaching her testimony and attacking her credibility as a witness. We disagree. The first inquiry is whether this evidence can be admitted under Rule 403 of the West Virginia Rules of Evidence. Rule 403 states that "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Under this rule, relevancy needs to be determined first. Then, if the evidence is determined to be relevant, the second inquiry is whether the probative value is substantially outweighed by its prejudice.

"Evidence which is irrelevant and immaterial and has no probative value in determining any material issue is inadmissible and should be excluded." *Smith v. Edward M. Rude Carrier Corp.*, 151 W. Va. 322, 331, 151 S.E.2d 738, 743 (1966). First, we find that this testimony could not be used to impeach Dr. Clark, because the ACOG bulletins were based on different topics and therefore Dr. Clark did not contradict herself. The briefs explain that, in a prior and unrelated case, Dr. Clark testified about an ACOG bulletin that addressed breech births. However, breech births were not at issue in this case and the

31

ACOG bulletin at issue in the prior case was not the ACOG bulletin at issue in this case. Because of the lack of contradiction, we do not see how Mr. Smith could have used this testimony to impeach Dr. Clark. Because the testimony regarding breech births is wholly unrelated to any issues in the present case, the testimony is clearly irrelevant and fails to meet the first prong of a Rule 403 analysis.

Next, we examine whether the testimony could be admitted under Rule 404(b) of the West Virginia Rules of Evidence. Rule 404(b) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, it allows for the admission of such evidence to show "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.*

Here, the prior ACOG testimony that Mr. Smith wishes to admit, came from previous lawsuits involving Dr. Clark. Mr. Smith contends that he wanted to use the prior testimony as an impeachment method; however, the testimony could be used to shed light on Dr. Clark's litigation history. The purpose of Rule 404(b) is to prevent the finding of liability or guilt in the present litigation based upon evidence alleging that a person has previously committed a crime or bad act. Evidence of the commission of other "offenses" or "acts of misconduct" is inadmissible to prove the party acted consistent with such prior behavior in the case at hand. *See* Louis J. Palmer, Jr., Robin Jean Davis, and Franklin D. Cleckley, *Handbook on Evidence for West Virginia Lawyers*, § 404.04[1][a] at 368-69 (6th

32

ed. 2015). *See, e.g.*, *State v. McDaniel*, 211 W. Va. 9, 560 S.E.2d 484 (2001) (evidence of defendant's prior crimes and bad acts was not admissible to prove that he acted in a similar manner in the current trial). Here, allowing Dr. Clark's prior testimony would do just that—it would inform the jury of Dr. Clark's prior litigation history. The jury, in turn, may equate her prior medical professional liability lawsuits with guilt in the current case.

The issues were fully briefed below, and the court held a 404(b) *in-camera* hearing after which it concluded that Mr. Smith "failed to adequately establish the relevance of this evidence in this particular case and how the probative value of the evidence would outweigh its prejudicial effect." Thus, after reviewing all of the evidence, we find that the precluded testimony was irrelevant and unduly prejudicial, and the circuit court committed no error by excluding this testimony.

### D. Testimony on ACOG's "Thirty-Minute Rule"

Mr. Smith argues that the circuit court erred when it admitted Dr. Frank Manning's (Dr. Clark's expert witness) allegedly undisclosed opinions on ACOG's "thirty-minute rule" because that standard was completely irrelevant to the timing of the infant's delivery. According to Mr. Smith, Dr. Manning introduced his opinions on the "thirty-minute rule" for the first time at trial, and therefore, the opinions constituted surprise and trial by ambush. Respondents rebut this, and note that the circuit court properly allowed Dr. Manning to offer testimony on ACOG's "thirty-minute rule" because the first testimonial evidence pertaining to the rule offered at trial occurred in Mr. Smith's case-in-

33

chief during the direct examination of his expert, Dr. Roberts.[18]  Therefore, Dr. Manning had the right to rebut Dr. Roberts' testimony.

Here, Mr. Smith attempts to characterize the admission of Dr. Manning's ACOG testimony as trial by ambush and unfair surprise— but this could not be further from the truth.  Rather, it was Mr. Smith's expert, Dr. Roberts, who offered the first testimonial evidence at trial regarding ACOG's "thirty-minute rule."  Per the trial transcript, Mr. Smith's counsel objected to the "thirty-minute rule" line of questioning during the direct examination of Dr. Manning.  The judge sustained the objection, and the examination of Dr. Manning continued.  After Mr. Smith's counsel conducted cross-examination, the jury was released for lunch.  At this time, counsel for Dr. Clark requested to make a very brief voucher for the record with regard to the ACOG "thirty-minute rule" to preserve for appeal.  The judge allowed Dr. Manning to testify outside the presence of the jury for appellate purposes, and noted that he would take this issue under advisement during the lunch break.

According to the transcript, the judge noted that when Mr. Smith's counsel first objected to the ACOG "thirty-minute rule," counsel indicated that the issue was first introduced with Dr. Roberts on cross-examination.  After reviewing the trial testimony

---

[18] ACOG's "thirty-minute rule" was mentioned in opening statements.  Then, it was first offered as testimonial evidence during the direct examination of Dr. Roberts. Mr. Smith's counsel questioned Dr. Roberts on the "thirty-minute rule," and Dr. Roberts offered his opinions.

during a lunch break, the judge realized that the ACOG "thirty-minute rule" was actually

first presented with Dr. Roberts on direct examination.

> THE COURT: With regard to the – Dr. Manning's testimony on the ACOG rule, it was my understanding when counsel approached the bench initially at the objection, and I believe Mr. Regan indicated that this issue was injected with Dr. Roberts on cross-examination for the first time, thereby injecting it into the trial, and I don't think that was – at least that was my understanding. Is that correct, sir?
>
> MR REGAN: Well, the way it went is, I said, "Look. Dr. Manning isn't disclosed to talk about this, and it hasn't been part of his pretrial disclosed opinions and it was in his deposition." And they said, "Oh. Well, Roberts talked about it, so now we want to respond to that." And I said, "Well, you brought it up with Roberts, and that that is not a permissible technique to get an undisclosed opinion in." In other words, I didn't have my expert talk about it pretrial. Now I want to get it in with him, so let me just shoot something at the other expert to say, "Well, now it's been brought up." I mean, if you could do that, it would be like an open door for all kinds of undisclosed opinions.
>
> THE COURT: Okay. That was my understanding, but – so I went back and pulled Dr. Roberts' testimony to see exactly how it played out with this 30-minute rule from ACOG. And it was actually brought up on his direct examination. And he was questioned pretty extensively about it in direct, and then he was cross-examined on it afterwards. So – and I have that transcript here. So, with that having been said, I don't think it's an overly complicated issue. I think the jury – obviously, we took the testimony outside the presence of the jury, and all counsel seems to be very familiar with it. I think there weren't any big surprises here with what's going to be said. I am going to allow him to testify in front of the jury on this issue, but we're going to keep it very limited, very restricted, just to basically what we did.

Because Dr. Roberts was "questioned pretty extensively" on this rule during direct

examination, "and then was cross-examined on it afterwards," the judge decided to allow

35

Respondents' expert, Dr. Manning, to testify on the ACOG "thirty-minute rule" in the presence of the jury. However, the judge did note that he was going to keep the testimony "very limited" and "very restricted" to what was done earlier outside of the jury's presence.

In Syllabus point 1 of *McDougal v. McCammon*, 193 W. Va. 229, 455 S.E.2d 788 (1995), this Court held:

> The West Virginia Rules of Evidence and the West Virginia Rules of Civil Procedure allocate significant discretion to the trial court in making evidentiary and procedural rulings. Thus, rulings on the admissibility of evidence . . . are committed to the discretion of the trial court. Absent a few exceptions, this Court will review evidentiary and procedural rulings of the circuit court under an abuse of discretion standard.

Syl. pt. 1, in part, *McDougal*.

Mr. Smith analogizes this situation to the factual scenario in *Graham v. Wallace,* 214 W. Va. 178, 588 S.E.2d 167 (2003), where the court found trial by ambush and unfair surprise. As such, we find it significant that Mr. Smith's counsel failed to exercise options available to prevent or lessen any unfair surprise resulting from this testimony. In fact, this Court "explicitly [held] that in order to preserve the claim of unfair surprise for appeal, the aggrieved party must at the very least move for a continuance or recess." *McDougal*, 193 W. Va. at 239-40, 455 S.E.2d at 798-99. Furthermore, as we suggested in *State ex rel. Rusen v. Hill,* 193 W. Va. 133, 141, 454 S.E.2d 427, 435 (1994):

> Our cases and the West Virginia Rules of Evidence have declared an implicit preference for a continuance when there

36

has been a discovery violation. *See* W. Va. R. Evid. 403 ("unfair surprise" is not listed as a ground for exclusion). *See State v. Barker,* 169 W. Va. 620, 623, 289 S.E.2d 207, 210 (1982) ("[e]ven if this were a 'proper' case in which to claim surprise, the appellant failed to move for a continuance, and, therefore, waived his right to one"); *Martin v. Smith,* 190 W. Va. 286, 291, 438 S.E.2d 318, 323 (1993) ("even given that the admission of Dr. Adams' testimony prejudiced Dr. Smith's case, we find such prejudice far from incurable. Dr. Smith could have easily moved for a continuance in order to secure a comparable expert witness").

Here, although counsel for Mr. Smith orally objected to the testimony at trial, a recess or continuance was never requested. Even assuming, for the sake of argument, that this was a situation where claiming trial by ambush or unfair surprise was proper, counsel never took the appropriate action. Counsel for Mr. Smith could have easily moved for a continuance or a recess, but failed to do so. As such, we find no error in allowing Dr. Manning to offer testimony of ACOG's "thirty-minute rule."

As noted by Mr. Smith in his brief, "one of the purposes of the discovery process under our Rules of Civil Procedure is to eliminate surprise. Trial by ambush is not contemplated by the Rules of Civil Procedure. Nevertheless, a new trial will not be granted unless the moving party was prejudiced." *Id.* at 236-37, 455 S.E.2d at 795-96. Once the record is closely examined, it is clear that Dr. Manning only testified on the ACOG "thirty-minute rule" *after* it had been brought up on the direct examination of Dr. Roberts. This was not an undisclosed opinion that surprised Mr. Smith's counsel or that prejudiced them in any way. The judge took this issue under advisement, examined the trial record, and

limited the testimony in time and scope. Therefore, we do not find that the circuit court committed reversible error by allowing testimony regarding ACOG's "thirty-minute rule." Taking this, along with our conclusion that the circuit court acted within its authority and discretion in allowing the testimony, we conclude that no abuse of discretion occurred.

### E. Failure to Strike Juror No. 82

Mr. Smith next asserts reversible error for failure to strike, for cause, Juror No. 82, who commented that Dr. Clark's daughter was a former employee at Juror No. 82's dry cleaning business and also that Cabell Huntington's lawyers had been long-standing customers of her dry cleaning business. Because the circuit court refused to strike Juror No. 82 for cause, Mr. Smith was required to use a peremptory strike to remove the juror from the jury pool. Mr. Smith contends that, because he was compelled to use a peremptory strike on Juror No. 82, he was also forced to keep another juror upon whom he may have exercised the strike and this amounts to reversible error. We disagree.

Upon our review of Juror No. 82's voir dire and the circuit court's conclusions regarding the same, we find no error. "The determination of whether a prospective juror should be excused to avoid bias or prejudice in the jury panel is a matter within the sound discretion of the trial judge." *O'Dell v. Miller*, 211 W. Va. 285, 288, 565 S.E.2d 407, 410 (2002) (internal citation omitted).

> Often, trial judges are faced with the task of deciding whether to keep a juror who *may* have biases or prejudices. "[T]he process of identifying bias or prejudice, except in clear

38

cases, can be a delicate one where the conclusion is finally drawn from the totality of the responses." *See* Daniel J. Sheehan, Jr. and Jill C. Adler, *supra,* at 634. Therefore, when considering whether to excuse a prospective juror for cause, a trial court is required to consider the totality of the circumstances and grounds relating to a potential request to excuse a prospective juror, to make a full inquiry to examine those circumstances and to resolve any doubts in favor of excusing the juror. When considering whether a prospective juror is prejudiced or biased, the trial court must consider all the circumstances surrounding the juror. The trial court must not only consider the prospective juror's promise to be fair but all of the circumstances at issue.

*Id.* at 289, 565 S.E.2d at 411. This Court has noted that

[t]he challenging party bears the burden of persuading the trial court that the juror is partial and subject to being excused for cause. An appellate court only should interfere with a trial court's discretionary ruling on a juror's qualification to serve because of bias only when it is left with a clear and definite impression that a prospective juror would be unable faithfully and impartially to apply the law.

Syl. pt. 6, *State v. Miller,* 197 W. Va. 588, 476 S.E.2d 535 (1996). In particular, it has been recognized that "[b]ias, in its usual meaning, is an inclination toward one side of an issue rather than to the other, *but to disqualify*, *it must appear* that the state of mind of the juror leads to the natural inference that he will not or did not act with impartiality." *Id.* at 288, 565 S.E.2d at 410 (Emphasis added).

In *State v. White*, 228 W. Va. 530, 722 S.E.2d 566 (2011), it was determined that a prospective juror occasionally worked for the lead detective's mother. Because of this connection, the defendant moved to strike. *Id.* at 538, 722 S.E.2d at 574. The prospective juror stated that although she sometimes cleaned the mother's house, she only

39

knew the detective by his name. *Id.* Moreover, when questioned whether her relationship with the detective's mother would affect the way she viewed the evidence, she answered no. *Id.* The circuit court overruled the defendant's objection, and decided that the potential juror's voir dire did not "really establish a personal relationship" between her and the detective. *Id.* "And even if it did, her answer to the question was that it would not influence her decision making in the case." *Id.* On appeal, this Court found no error in the circuit court's decision to not disqualify the prospective juror. *Id.* The Court stated that the juror had no relationship with the detective, and found "nothing in her responses to indicate that she had a 'fixed opinion' of this case or that she could not 'judge impartially the guilt of the defendant.'" *Id.* (quoting Syl. pt. 4, in part, *State v. Miller,* 197 W. Va. 588, 476 S.E.2d 535 (1996)).

We find no error in the circuit court's decision to overrule Mr. Smith's objection to Juror No. 82. Just as the prospective juror in *State v. White*, Juror No. 82 had a working relationship with a relative of an individual closely involved in the case—in *White*, a lead detective; here, a defendant. The basis for Mr. Smith's argument is two-fold: (1) Dr. Clark's daughter previously worked at Juror No. 82's dry-cleaning business; and (2) Juror No. 82's dry-cleaning business provided services to Cabell Huntington's attorneys and their law firm. During her individual voir dire, Juror No. 82 was questioned extensively by Mr. Smith's counsel, in part, as follows:

> Q. Not every juror is right for every single lawsuit that comes along. And, I guess, my first question would be, do you have any concerns about being able to sit on this jury such that,

because of your experience with Dr. Clark's daughter and her family, you may tend to favor Dr. Clark's side of the case as we begin? You know, not deliberately but just because you have that experience and because it's sort of, you know, there.

A. Right. Right. I don't believe that I would. I would try to be as fair as I could.

Q. Do you know Dr.Clark?

A. I do not know her.

Q. Okay. Have you ever had occasion to interact with her at all?

A. You know, I don't even believe I ever met her the whole time Katie [Dr. Clark's daughter] worked for me.

. . .

Q. [T]he question becomes, you know, again, you have this experience and do you think that, try as you might, to put all that aside, do you have concerns that even with all the effort you still may have some predisposition towards favoring a client that they [Cabell Huntington's attorneys] represent?

A. I don't think I would.


After finishing the individual voir dire for Juror No. 82, Mr. Smith's counsel moved to strike Juror No. 82 for cause due to her acquaintance with Dr. Clark's daughter, and because certain lawyers from the firm representing Cabell Huntington were customers of her dry cleaning business. The circuit court overruled the objection and explained that Juror No. 82 did not indicate any bias or prejudice, and upon questioning, she noted that she would be impartial and fair. Based on this information, the circuit court refused to strike Juror No. 82 for cause, and Mr. Smith's counsel then used a preemptory strike to keep Juror No. 82 from sitting on the jury.

41

The record in the instant case shows that Juror No. 82 *never met* Dr. Clark and there was no evidence that the juror was partial to Dr. Clark or Cabell Huntington. Although Mr. Smith attempted to elicit biases from Juror No. 82 during voir dire, the juror never indicated any evidence of bias or prejudice. In fact, Juror No. 82 asserted that she would examine the evidence and be "as fair as [she] could." Upon our review of the voir dire testimony, and the evidence before us, we can establish neither a bias toward Dr. Clark's daughter, nor a bias toward Cabell Huntington's attorneys. Furthermore, just as prospective juror's testimony in *State v. White*, Juror No. 82's testimony clearly shows that she would not be influenced in this case, and would not be partial toward any party. Therefore, when examining the totality of the evidence, we find no error.

### F. Verdict Not Against the Clear Weight of the Evidence

The last issue raised by Mr. Smith is that the verdict was against the clear weight of the evidence. More specifically, Mr. Smith argues that the case was tried under improper instruction, and that the evidence at trial did not match with the conclusion that the jury reached. Respondents disagree, and maintain that the jury carefully considered the evidence presented to it at trial, found that Mrs. Smith was fully dilated at the time of attempted delivery, and concluded that there was no breach of the standard of care.

This Court held, in Syllabus point 9 of *Neely v. Belk Inc.*, 222 W. Va. 560, 668 S.E.2d 189 (2008): "When a case involving conflicting testimony and circumstances has been fairly tried, under proper instructions, the verdict of the jury will not be set aside

42

unless plainly contrary to the weight of the evidence or without sufficient evidence to support it." Further,

> in determining whether there is sufficient evidence to support a jury verdict the court should: (1) consider the evidence most favorable to the prevailing party; (2) assume that all conflicts in the evidence were resolved by the jury in favor of the prevailing party; (3) assume as proved all facts which the prevailing party's evidence tends to prove; and (4) give to the prevailing party the benefit of all favorable inferences which reasonably may be drawn from the facts proved.

Syl. pt. 10, *id.*

In a medical professional liability case, where the Court reinstated a defense verdict rendered by a jury, this Court stated:

> An essential element of our judicial system is the right of a party, in most cases, to request a jury of his or her peers to render a verdict based upon the evidence and testimony presented. Because of the jury's unique ability to see the evidence and judge the demeanor of the witnesses on an impartial basis, a jury verdict is accorded great deference. It is the province of the jury to weigh the testimony and to resolve questions of fact when the testimony conflicts[.]

*McNeely v. Frich*, 187 W. Va. 26, 29, 415 S.E.2d 267, 270 (1992).

Although subjecting the trial court's decision to review for an abuse of discretion, we also noted in *In re State Public Building Asbestos Litigation* that a new trial should rarely be granted and then granted only where it is "'reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done.'" *In re State*

43

*Pub. Bldg. Asbestos Litig.*, 193 W. Va. at 124, 454 S.E.2d at 418 (quoting 11 Charles Alan Wright and Arthur R. Miller, *Federal Practice and Procedure* § 2803 at 32–33). *Accord Morrison v. Sharma,* 200 W. Va. 192, 194, 488 S.E.2d 467, 470 (1997) (same).

In *Shiel v. Ryu*, 203 W. Va. 40, 506 S.E.2d 77 (1998), this Court addressed, in detail, the province of a jury and the importance a jury plays when evaluating evidence during a trial.

> While syllabus point three of *Asbestos Litigation* authorizes a trial court to weigh the evidence in the context of granting a new trial, such authorization does not obviate the essential role of the jury in resolving conflicting evidence. We have consistently maintained: "'It is the peculiar and exclusive province of a jury to weigh the evidence and to resolve questions of fact when the testimony of witnesses regarding them is conflicting and the finding of the jury upon such facts will not ordinarily be disturbed.' Syllabus Point 2, *Skeen v. C and G Corporation,* 155 W.Va. 547, 185 S.E.2d 493 (1971)." Syl. Pt. 4, *Young v. Ross,* 157 W. Va. 548, 202 S.E.2d 622 (1974). Syllabus point two of *French v. Sinkford,* 132 W. Va. 66, 54 S.E.2d 38 (1948) explains: "Where, in the trial of an action at law before a jury, the evidence is conflicting, it is the province of the jury to resolve the conflict, and its verdict thereon will not be disturbed unless believed to be plainly wrong."

Here, we find that Mr. Smith has failed to put forth anything in the record that would warrant overturning the verdict rendered by the jury. When analyzing whether a verdict is against the clear weight of the evidence, "every reasonable and legitimate inference, fairly arising from the evidence in favor of the party for whom the verdict was returned, must be considered, and those facts, which the jury might properly find under the

44

evidence, must be assumed as true." Syl. pt. 12, *Neely v. Belk Inc.*, 222 W. Va. 560, 668 S.E.2d 189 (2008). The record presented to us reveals that this case was fairly tried. While conflicting evidence was presented below—specifically with regard to Mrs. Smith's dilation—all parties presented competent experts, credible witnesses, and sufficient evidence over the course of an eight-day trial. Both experts and lay witnesses were cross-examined, and fair evidentiary rulings were made thoughtfully by the court. Viewing the evidence in a light most favorable to the Respondents, the record illustrates that the jury heard testimony by Mr. Smith's experts and lay witnesses regarding his theory of "timing" as it pertains to the labor and delivery, and ultimately, the jury credited and accepted Dr. Clark's testimony that a vaginal delivery was attempted because she was the physician in the room who physically examined Mrs. Smith and noted that she was fully dilated; that she used forceps to assist in the delivery and she would not have been able to do so if Mrs. Smith was not fully dilated; and that in her medical judgment, she first tried a vaginal delivery in an attempt to deliver the infant faster.

After reviewing all reasonable and legitimate inferences in the Respondents' favor, we conclude that the verdict rendered in this case in Respondent's favor was not "against the clear weight of the evidence," and the verdict shall stand. It has been well-established in this Court's case law that "[i]t is the peculiar and exclusive province of a jury to weigh the evidence and to resolve questions of fact when the testimony of witnesses regarding them is conflicting and the finding of the jury upon such facts will not ordinarily be disturbed." Syl. pt. 5, *Grimmett v. Smith*, 238 W. Va. 54, 792 S.E.2d 65 (2016) (quoting

45

Syl. pt. 2, *Skeen v. C and G Corp.*, 155 W. Va. 547, 185 S.E.2d 493 (1971)). It is not the province of this Court to invade the jury's determination when it is clear that the verdict was based on a reasonable interpretation of the evidence presented. As such, we find that the verdict in this case should be upheld.[19]

## IV.

## CONCLUSION

For the reasons set forth above, we affirm the November 12, 2017 order of the Circuit Court of Cabell County denying Mr. Smith's motion for a new trial and renewed motion for judgment as a matter of law.

Affirmed.

---

[19] In light of our holding—that the verdict in favor of the Respondents should be upheld—we need not address Dr. Clark's cross-assignment of error regarding the denial of her motion for judgment as a matter of law.